Go ahead, please. Good morning, Your Honors, and may it please the Court. My name is Aiza Bajwa, and I'm a law student representing petitioners Marbelin Melendez-Landaverde and her family. I'd like to note that petitioners are here today in the audience. This record is clear. The Salvadoran authorities could not or would not protect Marbelin and her family. She sought protection from three police departments. Two did not take a report and did not protect her. And the third wrote a deficient report and also did not act to protect her. She previously sought protection from a Justice of the Peace who entirely ignored her allegations of sexual and physical abuse and failed entirely to refer her abuser, Ricardo, to the police. Instead, the Justice of the Peace issued a mere 90-day restraining order that left Ricardo understanding he would not go punished. On this record— But you agree that Ricardo never had any direct contact with Ms. Melendez-Landaverde after that restraining order until she went to his church while he was presiding over mass, correct? She did not have direct contact, that is correct, Your Honor. However, after Marbelin and her family saw Ricardo at this mass, Ricardo escalated his persecution of Marbelin and her family by recruiting a notorious transnational gang, MS-13. Well, when they first came to her, they didn't know who she was, right? They had to ask her, who are you? How long have you been here? Your Honor, the questioning that the gang presented on its first encounter with Marbelin demonstrates that they were merely confirming her identity rather than trying to figure out who she was. The questioning was that, who did she have problems with? Who was—did she have problems with her uncle? And did she have a restraining order against anyone? So that indicates that the MS-13 was actually trying to confirm that she was the niece of Ricardo, the person against whom she had a restraining order, rather than, you know, a random individual who they were planning to extort. Ms. Pajaro, what would—what's in the record that would compel us to that finding? We're on substantial evidence review here of the agency. Yes, Your Honor, you are on substantial evidence review. Here, with the police report in particular, there are several facts that compel— Well, I guess the—let me—I'm sorry, let me be more specific— compel a finding that Ricardo recruited the gangs to persecute Ms. Melendez-Landeverde. Your Honor, there's only evidence in the record that Ricardo sent MS-13. The IJ actually misstated the record here in saying it was unclear on this fact. Edwin testified in his declaration at Carr 667 that on two separate occasions, the gang mentioned that Ricardo had sent them. They said that directly to him. Marbolin, in her oral and written testimony, also corroborated this fact. She said that the gang told her that her uncle sent them, her uncle with whom she had problems and against whom she had a restraining order. Where is that in her transcript? I don't see her making that explicit statement. Your Honor, it's in both her declaration and in her— Well, point me to her. I have her transcript. Point me to her transcript. Your Honor, at the — in the transcript at Carr 211, she says that she was sure it was Ricardo, and that's her credible testimony. Right. But let's go back to Judge Johnson's question. What compels that conclusion? Your Honor, the IJ found Marbolin's testimony credible, and the only evidence in the record demonstrates that MS-13. sent — was sent by Ricardo. There is no evidence to the contrary. So she also testified in her declaration to the fact that she had problems with her uncle and that she had this restraining order, and that's at Carr 676. She also testified that that was the only uncle with whom she had problems. Well, in her testimony, she also says that there was never a police report written, and that contradicts the record, right? Your Honor, that does — that might refer to the two other police reports that she tried to file prior to filing a police report with the National Civil Police. No, it's very clear from the context of the testimony exactly which time she is referring to. I'm looking at ER 213. Your Honor, she also did try to file those two other police reports that were not filed. It's possible that this was a misstatement, but here she did file a police report with the National Civil Police, which you can find at Carr 655. Turning to the police response more broadly, here the police response was deficient. The National Police finally did take a report. However, it demonstrated that the authorities were not even willing to document Marbolin's  Here, the police report did not comment on Ricardo's last name. It also entirely failed to mention that MS-13 was the group persecuting Marbolin. Instead, it said people of bad reputation, which is a gross understatement of a notorious transnational gang. It also did not mention that the death threats came from the gang. In addition here, the police promised to patrol and investigate. However, there is no record evidence that they took any action on Marbolin's complaints. Marbolin testified that she did not see the police in the entire month after she made the report. But she also never followed up, right? That is correct, Your Honor. The record doesn't indicate that there was any inquiry that she made or her partner made or anyone made about what the police was doing, right? So it's only speculation about whether the police actually took any action, whether they investigated or not, correct? Your Honor, we're bound by the record here, and in the record we have her testimony that she did not see the police for the entire month. Edwin also... Right, but she also never inquired, right, about the status of any investigation or whether there was any update. That is true, Your Honor. However, per this Court's precedent, a petitioner is not required to continue reporting to the police if such reports would be futile. As they were here, Marbolin had a... What's the evidence that compels that any report would be futile? Here, Your Honor, there is no evidence that the police took any action on Marbolin's complaint, and so she had no reason to believe that they would take any action going forward on her complaints. And so per this Court's precedent in Bringus Rodriguez, for example, that is sufficient. Her own subjective view that this would not provide any more fruit is sufficient to demonstrate... We have kind of an extended record of maybe they didn't respond in the way that petitioner had hoped at certain times, but there's a record here of several responses by the police. It may give rise to an inference either way that they were willing and able or unwilling and unable to protect the petitioner, but that's not our job to decide between those inferences where there's substantial evidence. Respectfully, Your Honor, I would disagree that there are two possible inferences here. Per this Court's precedent in J.R. v. Barr, some official responsiveness is not enough to demonstrate unwillingness or rather willingness and ability. But that's when the government's promised action but taken none. But here you had a JOP hearing, you had a restraining order, you had a police report. That's when zero action was taken, correct? Your Honor, I'd point again to J.R. where there actually was far more action taken by the Salvadoran government to protect the petitioner. There, the police investigated... No, I'm just going to quote it. When the government has promised further action but taken none. I don't think here you can say there was no action taken by the government. With respect to the police... Or is that your assertion? Your assertion is they didn't take any action? With respect to the police report, Your Honor, that is our assertion, that they took no further action aside from their promise. But you think the taking of a police report, the creation of a police report, constitutes no action. That's your position? Yes, Your Honor. It does not constitute meaningful action here because, as this Court held in Antonio v. Garland, this promise of future action with none taken does demonstrate unwillingness or inability. Well, I guess that's not quite the way that our cases seem to frame it, right? We're asking whether they're unwilling or unable or could or would provide protection. That is, it need not be a certainty. They do not have to have established a record of past showing of protection, but just that they are willing and able to do that. In terms of trying to understand the level of generality here, we have various actors, Justice of the Peace, we've got the police, different agencies with varying levels of responsiveness. Can you help me with understanding who needs to be shown? Is it the government generally or, I mean, you're pointing to the police not being responsive, but the Justice of the Peace issued a restraining order with respect to it. What does the law point us towards in terms of who has to be willing and able and how willing and able they need to be to prevent persecution? Your Honor, here, Petitioners only need to show that some actors in the government were unwilling or unable. It does not have to be the entirety of the government that is unwilling or unable. Really? Anyone? So if the Justice of the Peace is willing to issue another protective order, but the police aren't going to be as, are going to commit to, but may not be visibly responsive to some peace, that's enough to show that the government as a whole is not willing or able to protect its people? Yes, Your Honor. I'd also take issue with your characterization of the Justice of the Peace proceeding as demonstrating willingness and ability, as we argue in our briefing that proceeding was also unfair and biased, such that it does not demonstrate a genuine willingness to take Marbolin's complaint. Was the protective order violated? Your Honor, it was not violated during the term. However, Ricardo did escalate his persecution. He enlisted the notorious transnational gang MS-13 to persecute Marbolin and her family, terrorizing with death, terrorizing them with death on three separate occasions after the restraining order. And so here we have a link between the Justice of the Peace proceedings and the continuous persecution of Marbolin and her family. You cited Antonio versus Garland, but isn't that distinguishable there because the immigration judge ignored the testimony of the mayor of the petitioner's village of that town that said they would have supported the persecution? We don't have anything like that here. That's correct, Your Honor, but we don't have anyone in the government on record here saying, well, I would support the persecution of these petitioners, right? That is true. However, the standard is unwillingness or inability. We do not need affirmative standards, affirmative statements here that anyone in the government would. But you would agree that case is distinguishable that you just cited earlier? Your Honor, in some aspects, but in the key aspect of no future action taken, but a promise to, that is very similar here where in that case, the Justice of the Peace had promised to refer the action for a criminal proceeding. However, there was no record evidence that that actually occurred. And that's where this court found that a promise of future action with none taken demonstrates. Can we talk about the legal standard? You argue that the immigration judge got the legal standard wrong. But when I look at the petitioner's brief to the BIA, it just makes a factual challenge to the actual decision and it doesn't challenge the standard at all. Your Honor, petitioners challenged the standard by citing the correct standard from J.R. versus Barr in their brief to the Board of Immigration Appeals and further. When is citing the correct standard a challenge to the standard? Your Honor, here, because the immigration judge had cited the wrong standard, they corrected that in their own briefing. No, actually, if I look at your brief, ER 46, in this case, the IJ found that there, the government, that's a typo, is not unwilling and unable to control Ms. Melendez's persecutors. I don't see that. You're actually making an affirmative statement that the IJ used the right standard and that's the topic, first sentence of this section. Your Honor, I'd also just point that the Board of Immigration Appeals adopted and affirmed the IJ's decision with respect to unwilling and unable. And they used the correct standard, correct? The Board of Immigration Appeals or the immigration judge? The BIA. The BIA adopted and affirmed the decision and therefore the same error was made by the Board of Immigration Appeals. If that's the standard for preserving a challenge to the standard review applied below, every brief filed to us would have to be taken to raise an issue with the district court's application of the standard review, right? Your Honor, here, we're challenging the IJ's application of the standard, not the . . . Right, but as between the BIA and the IJ. All that we have is a recitation of the standard review, which is what we get in every single one of our briefs. So why should that be enough to preserve it? That is correct, Your Honor. However, because the key issue here is that the Board of Immigration Appeals adopted and affirmed the decision. So the IJ's decision is what this court is reviewing, especially with respect to unwilling or unable. And there they did cite the incorrect legal standard. And we also have plenty of other legal errors that I'm happy to discuss. Okay, so throughout this BIA decision, they say the government is unable or unwilling to control the private actors who the respondents claim to fear. And you're saying we should ignore all of that, where they cite the correct standard, the BIA, in its own decision, and only look at the citation to Matter-Burbano to say, oh, no, they got the standard wrong. Is that your argument? That is correct, Your Honor. How can we take judicial notice of matters that weren't before the agency? Your Honor, per Schen v. Garland, this court can take judicial notice of foreign laws when it is looking at the de jure content of those laws rather than the de facto application of those laws. And that is exactly what petitioners are asking for here. Well, but that's that lead, but if the agency hasn't had a chance even to pass on that question, this is a theory that wasn't, an argument at least, that wasn't passed on by the agency. So essentially, it's introducing, inviting us to rule on a basis that the agency didn't have an opportunity to rule on. Your Honor, here, the petitioners did actually raise the issues that the request for judicial notice notices several foreign laws that go towards the arguments of PSG, nexus, and internal relocation. And the petitioners did brief those issues before the BIA and the IJ. So they are properly before this court. Those issues were still argued at each stage in the process. And therefore, this court can rule on them per Schen v. Garland again. Can I ask you, in my eyes, you lose credibility when you say there are at least three or four times where the BIA cites the correct legal standard in its own decision. But because they cite matter of Bourbon, you ignore three or four correct recitations of the legal standard. And you just assume the wrong standard was adopted, which I actually don't agree that the IJ, they may have phrased it differently, but I think the standard was correct there. Or even if, let's assume it was error, to say ignore three or four correct recitations of the standard and just look at where this is what, and actually, let me go back to your matter of Bourbon argument. You're saying because they cite to matter of Bourbon, they've adopted the entire immigration judge's decision. And yet in the BIA decision, it says because government acquiescence is dispositive, I'll just read it, the above analysis dispositive of the respondent's asylum and withholding of removal claims, thus it is not necessary to address the remaining appellate arguments. And so I guess I'm still struggling with your position that if you have multiple contrary statements to the BIA, you ignore all of that and just rely on Bourbon to assume that you adopt wholesale the IJ's decision. Your Honor, per this court's precedent in Persmova and Abebe, the BIA is required to explicitly limit its affirmance when it cites to matter of Bourbon. Oh, and so here we have, where is, it is not necessary to address the remaining appellate arguments. Where is that not an explicit enough disavowal of adopting the entire opinion? What more would they need to say? How explicit would they need to be? What language would satisfy your test? I'm not entirely sure what language here, Your Honor. However, I'm looking at ER five. Yes. It's the fourth paragraph. I'm just reading the first sentence. So you're saying that is not an explicit enough. It's not? This, thus it is not necessary to address the remaining appellate arguments? Yes, Your Honor. We do believe that that is not enough because at CAR 4, where the immigration, rather, the Board of Immigration Appeals cites to matter of Bourbon, they do not explicitly limit their affirmance there. They adopt and affirm the decision in its entirety and then later do have this line. However, it's unclear that that is a limiting of the Bourbon affirmance here. I think you're almost three minutes over your time. Apologies, Your Honor. I'd like to conclude now unless my colleague has any more questions. All right. Thank you. Thank you so much for your time. They're saving it for rebuttal. So I think you're next. No, I think it's a rebuttal. Correct? Yes, it's a rebuttal. May it please the Court. My name is Jonathan Robbins. I'm here on behalf of the United States Attorney General. Good morning to everyone. The Court asked the parties to address the two issues in this case that are properly before the Court, whether the Salvadoran authorities would be willing and able to protect the Petitioners, and whether or not the Salvadoran authorities would consent or acquiesce to any potential torture of Petitioners under the Convention Against Torture claim. Now, as the Court has already alluded to, the standard by which this Court assesses these questions is under the substantial evidence standard of review. That means the record has to be so compelling, so overwhelming, that no reasonable fact finder could have found as the agency did in this case. Well, after the Petitioners filed their police report, the MS-13 gang came again and threatened their lives. I don't see how is that a willingness and ability to protect them. Well, so I think it's important to look at what the Petitioners provided to police and then look at the police response. If you take a look at page 655 in the record, the police report that they filed with the National Civil Police, it didn't really say that much about gang members. The only reference to gang members in that report that they provided to police was that the complainant, quote, the complainant also manifested that such man accompanies himself by people of bad reputation, so they fear that something serious might happen to them. Therefore, she chose to be present in this police unit to file the respective complaint for the corresponding legal proceedings. So, they didn't. But they're alleging that the police are protecting MS-13. Well, there's no. And that's why they didn't identify them as MS-13 and just said people of bad reputation. Well, at the time they filed this report, the police, given the scan nature, they haven't provided any names, any details about these individuals, at least according to this report. The police said they took this report, they said they would investigate, and they said that they would patrol the area. Now, Petitioners' argument is entirely based on gaps in the record. It's based entirely on speculation. They're speculating that the police are working with the gangs, but there really isn't any evidence of that. So, at best, you could say that there's a gap in the record. And when there's a gap in the record. But the Petitioner's husband has seen MS-13 gangs and knows that they are at least working with the uncle. That's evidence in the record. That is speculation. The Petitioner's husband speculated that he was working with the gangs. Now, but even if you credit that notion that the uncle has worked with the gangs, that's not the question. The question is whether the Salvadoran officials would be willing and able to protect them from those gangs. And the police were given scans. But then I go back to the same thing. They made this police report, and the gang showed up again. Well, look, the police can't provide 24-7 Secret Service protection in El Salvador. But the question is, is whether the police response was appropriate and to what was being claimed. The Petitioner's did not give them any names of any gang members. Well, they said that they gave the last name of the uncle, but the police chose not to put his last name in and just identify him as Ricardo Ildefonso. Well, look, I don't know why the last name isn't there, but they did identify him by name, Ricardo Ildefonso. There's no reasonable argument that that's referring to somebody else. And again, this is based on speculation, right? They're speculating that the governmental authorities are working with MS-13, but there isn't really evidence of that. And in order for the record to compel a contrary conclusion, you would have to find some piece of evidence that definitively shows that that's the case. Speculation is not sufficient to meet that burden of proof. And again, this is not the only response that the Petitioner has received from the Salvadoran authorities, as Your Honors have already discussed. When they went to authorities regarding the initial problems with the uncle, they received swift and effective response from the authorities. Mr. Robbins, when you have a 12-year pattern of alleged persecution, not from some diffuse set of sources, but from one actor in a way that, as the record suggests, escalates over time, how can we just take bit by bit in trying to understand whether they're willing or able to protect? The problem isn't addressed. Again and again and again, Ricardo is engaging in these acts of persecution. Well, respectfully, Your Honor, I would push back on the notion that this was a constant escalation. When the authorities initially filed the restraining order, the Petitioner admitted she never had any direct contact with the uncle again. So the notion that it was escalated with the uncle, I would respectfully push back on that point, that the record shows the exact opposite, in fact. Well, in which time period is this? This is just towards the end. This is after she received the Justice of the Peace restraining order. She claims, according to her testimony, she never had direct contact with her uncle again. She didn't need to if, according to the theory of persecution here, the uncle was able to recruit the gangs to do the work. Okay, but it's important to understand, as each situation happens, she goes to the police and gets a particular response. So when the uncle was the only one that was causing the problem, she went to the authorities, she got a restraining order, never had contact with him again. Then when it was the gangs, she filed a police report, but the information she gave was much less fulsome than it was when she was before the Justice of the Peace and the uncle was there. She didn't provide any names or any details. The only thing they knew was that this uncle associated her. But what in the record, what protection did she get from the police after she filed the police report? Unless you're arguing that just the taking or creation of a police report, that that's sufficient to satisfy the government willingness and ability to protect. Well, the police didn't only file a report. The petitioner testified that the police told her that they were going to investigate and that they were going to patrol the area. Now, she says because she never saw them, she assumes that this was never done. But that's only an assumption. She doesn't actually know that. But aren't you also speculating the reverse, that they said this was never done? They said they were going to investigate and patrol and they did. Let's assume it. That's speculation too. Fair enough. But the burden of proof of demonstrating this is on the petitioner. So when there's speculation either way, it's the person with the burden of proof that the claim fails if there's a gap in proof. And that's the problem here. The petitioners are speculating. The government isn't harmed by the speculation because the burden of proof doesn't lie with us. But let me just ask you, are you — is it the government's position that just the taking of a police report is sufficient evidence of ability and willingness to protect? It depends on the circumstances of each case. But I would say not if it's only lip service or if it's — or if the taking of a report is some sort of, you know, sham or in some way. And what evidence is there in the record that that's not the case here? Because the police promised that they would do more than the report. Again, the petitioner didn't provide any specifics about these gang members. So how are the police supposed to do anything other than investigate and patrol? It seems to me that their promised response in this situation was appropriate, given the information that they received. Now, if there was something more here, if the petitioners had followed up or instead — they just left a month and a half later. How long were they supposed to stay to stick around to see if the police were going to do anything? Well, Your Honor said that they were threatened again after they filed this report. If they had gone back to the police and said, hey, we were threatened again, what's the process — what's going on with this investigation? Or if they had provided more details about who had threatened them, maybe the police would have responded. We don't know. We're simply left with gaps in the record. We just simply don't know. And claims which are based on speculation — But you're also arguing that leaving after a month is not enough time. So my question is, what is the sufficient amount of time that you can draw, then, the opposite conclusion, that there isn't an ability or willingness to protect? Well, I don't know that it's — Two months? Is it six months? One year? I don't know that there's a specific — There's no specific set amount of time. These are not bright lines. But you know one month is not enough. It's not a question of — maybe one month might be enough in certain circumstances, depending on the nature of the harm that the individual is facing. What I'm saying in this case, it was reasonable for the IJA to conclude that we don't know enough here about what's going — other than that the police response was appropriate in these circumstances, given what happened. But what evidence is there in the record that one month was not enough here in this case? Well, first of all, the Petitioners were never physically harmed. They were only threatened, right? And they were threatened multiple times. So normally when we talk about persecution and whether threats are sufficient to rise to the level of persecution, those threats are usually accompanied by something more severe that shows that there's going to be — physical violence of the uncle to the gangs. If the theory is, is that the — there's nothing — is there anything else in the record that the gangs were pursuing Ms. Melendez-Lendeverde for any other reason than the involvement of her uncle? Well, there's mixed evidence in that regard, Your Honor. As Judge Koh already alluded to, the initial encounter with the gangs made it — sure made it seem like the gangs didn't know who she was. That cuts against the notion that these individuals were there at the direction of Ricardo. Well, is there — you know, we see lots of cases where the contact is addressing things like extortion, other sorts of crime. This is an encounter where why doesn't the record compel at least, as to this step, that the gang contact was for no other reason but at Ricardo's instance? Well, even if you said that the record compelled that, that's not the question before the court. The question before the court is whether the Salvadorian authorities would do anything about it, whether the international protection has failed here. That's the question. Right. But now this is to circle back. Okay. So Ricardo has wielded violence against Ms. Melendez-Lendeverde. There's nothing in the record to support any other reason for the gang's outreach to the petitioner and her family. And he's already shown that he's willing to use violence. So why would we need any — this goes back to the point of the threat. Why would we need anything more than — and again, this is following up on your point. It gets more to the persecution than the willingness and ability. But why would we need anything more than those threats and a lack of visible police action to reach the opposite fineness to willingness and ability of the government to protect? Your Honor, I don't see how lack of visible police action is enough to compel a contrary conclusion. That's just an assumption. Again, the petitioners never followed up with the police. They don't know if they followed through with their investigation. They don't know if they were patrolling the area. Just because you didn't see the police doesn't mean that they weren't doing a patrol, right? I mean, so again, we're talking about the record has to be so overwhelming that the agency must have concluded to the contrary. And the evidence is simply too scant to meet that standard in this case. I see I have a little bit of time left. I just want to briefly talk about acquiescence. And I wanted to address Your Honor's question. You asked about what sort of level is it that needs to be unwilling or unable or what level needs to acquiesce. Right, the individual official, the country. With acquiescence in the CAT protection context, the court's case law is clear that it can be a single local official. But that can be undermined by relocation. And you'll note that the board and the immigration judge in this case pointed out that the Petitioners didn't have any problems when they didn't show that they wouldn't be able to relocate. So that undermines the notion that even if they had a problem with a specific local official, which they didn't show that anyway, but that that would be enough to demonstrate acquiescence of the Salvadoran government. But to answer Your Honor's question, in the CAT context, it can be as much as a single local official. In the asylum withholding context, the law is, I think, a little bit more holistic. It depends on the circumstances of the case, but if the main, if the government is, I mean, the analyses that I've always seen in that regard have always sort of been the government as a whole or the general authorities. And that if there's a rogue official in that context, that that can be overcome by the general government's ability and willingness to do something. But that's not true in the CAT context, because the CAT context has specific regulation that I think says a public official. And so that language in the regulation makes it different for the CAT, for CAT purposes. In this case, because the BIA didn't reach the issue of relocation, it would be inappropriate for us to rely on that as a basis. I thought the board did reach the issue of relocation. No, I'm just looking. It says they've... Only in the CAT context. In the CAT context, it says I'm on AR-6. I guess I'm looking at AR-5. And at least as to asylum and withholding, they're saying because the state action is the unwillingness and inability is dispositive, it's not necessary to address the remaining appellate arguments, including those related to the availability of relocation. I agree with Your Honor that relocation is not at issue with respect to asylum and withholding of removal. But relocation is actually assessed a little bit differently under CAT protection. And that is in the board's decision. On page six in the last paragraph of the big paragraph, of the last sentence of the big paragraph, the record also reflects that the immigration judge properly considered the respondent's ability to avoid future torture by relocating within El Salvador as one of the factors in determining whether the respondent's established that it would be more likely than not that they would be tortured. So in the... It's actually a little bit unusual. In the CAT context, relocation is assessed a little bit differently than in the asylum context. In the asylum context, the burden of proof of relocation depends on whether an individual has established past persecution. In the CAT context, this Court actually has a bit of a unique law in that it's nobody's burden on relocation. It's just simply a factor to be considered in terms of the likelihood of harm. So relocation, because it's assessed differently with respect to asylum and withholding and with CAT, I think it is preserved in the board's decision with respect to CAT because it expressly says it. Okay, I agree with you on CAT. Okay. On asylum and withholding, I think it'd be inappropriate. Well, the point that I was trying to make with respect to relocation is that I was talking about why the record doesn't compel reversal of the denial of CAT protection. So just sorry if I wasn't clear about that before. So I see that I'm in the yellow, so subject to the Court's questions, I don't have anything much more to add, unless Your Honors want to talk about the judicial notice issue or anything else. No, thank you. Thank you very much for your time, Your Honors. Good morning, Your Honors, and may it please the Court. Lorena Ortega-Guerrero for Petitioners. I'd like to make a few clarifying points. First, the IJ stated that the police had patrolled the area on page 106, and the government similarly engages on these impermissible speculation. However, we are limited to the record before us today, and the record demonstrates, the evidence in the record demonstrates that there is no evidence to indicate that the police did patrol. For example, Marbilin and Edwin both testified that they never saw the police patrolling the month after they said that they would, as indicated on page 213. This is particularly troublesome, given that the point of police patrol is to be seen and deter the perpetrators. Marbilin and Edwin also worked and lived in the same location, so it is unlikely that they would not have seen them if the police did patrol. Petitioners were also not aware of the police taking further action to question— I'm sorry, I'm looking at 106. I don't see that. Can you help me out? Which paragraph is that on? Of course, Your Honor. It is on the second full paragraph. It says, here respondents indicate that the gang made threats in April of 2021. The police sent a patrol to patrol the area. However, there is nothing in the record to indicate that this is true. Rather, the evidence in the record indicates that Marbilin and Edwin did not see the police patrolling. Similarly, they never followed up with them, as Marbilin testified on page 677 of the record. You know, this is the main, I think, issue here. It seems like you're asking us to draw different inferences from the record evidence than what the agency did, and I just don't see how that satisfies the highly differential substantial evidence standard. Your Honor, we are not asking for a different inference. This is, the only inference is that they did not see the police. There is nothing to support that the police actually came. Right, but saying I didn't see the police doesn't mean that the police did nothing. Your client never went back after the third threat, or never inquired of the police. Of, after you took my police report, do you have any updates? What are you doing? There was no inquiry. So there is a, I would kind of agree with your opposing counsel, there is a, there are some gaps in this record. Your Honor. That do require inferences. Your Honor, under this court's precedent, an individual is not required to return to the police if following up would be futile. Here, Marbalyn had already had. Okay, what's the evidence that it would be futile? She went to the police twice. She got a restraining order, did not have any contact with her uncle directly during that, after the restraining order, until she went to his church where he was performing mass. Just to clarify, Your Honor, this was not, the test, the evidence doesn't say that this was Ricardo's church. But it says he was performing mass, correct? Yes, he travels around giving mass at different locations. But they, they. Understood that he didn't go to the church looking for her. Nothing in the evidence indicates that. However, shortly upon seeing Ricardo at church, MS-13 first approached petitioners. And they said, who are you? How long have you been living here? To Marbalyn, they were clarifying who she was. However, in the two interactions that followed, they did explicitly say to Marbalyn that they were there because of an uncle with whom she had problems and an uncle against whom she had a restraining order. I'd also like to note that they, Edwin's testimony explicitly says that they said Ricardo's name to him, as indicated on page 667 of the record. Ms. Ortega-Guerrero, what are we to do with the fact that the petitioners fled, you know, within a month or so of this gang involvement? You know, to pick up on, I think, Judge Cozine's line of questions, how is that enough time to establish that the government is unwilling or unable to protect? We do have some cases, I think, that suggest that that isn't standing alone enough. Your Honor, first, MS-13 did return after they had reported and the police had promised to act and threatened them with death and forced them into exile. I'd like to also point this Court to the significant country conditions evidence before the record that indicates that in El Salvador, when MS-13 makes threats, they follow up on these threats, including with death or other forms of torture. Here, petitioners were aware that they had sought protection and nothing, they were not aware that anything had been done to protect them. Quite the opposite, MS-13 had returned to threaten them again. Therefore, this, they reasonably did what they needed to do to ensure the well-being of their family. I'd also like to quickly note that petitioners are not speculating that the government is unable or unwilling without support from copious country conditions evidence. And I specifically point out the expert reports, including page 308, that speaks to the fact that violence against women is regularly ignored by the Salvadoran police, as well as police regularly turning a blind eye to gang violence on page 315. I see I'm out of time, I apologize, so if this Court has no more questions. No, thank you. Thank you very much to all counsel, this was an extremely helpful argument. Thank you.
judges: HURWITZ, KOH, JOHNSTONE